This is case number 410-0463. It is Rodarmel v. Pneumo Abex and Honeywell v. the appellate Reagan Simpson and Colleen Bain. I got something right finally. For the appellate James Wilder, have you two split your time with the clerk? Yes, we have. Okay, you may proceed then. May it please the court. While I would be glad to address questions on any issues in this case, I would otherwise focus today on the household duty, the green sheets, punitive damages, and the conspiracy instruction if I have time to cover all four of those things this morning. On the household duty, I believe that we adequately explained the policy reasons for not recognizing the household duty, and rather than repeat those, I'll just say that in a conspiracy case, those policy reasons, limitless liability and no relationship between the plaintiff and the defendant, are all the more important and pertinent. In fact, the jury instruction in this case that sets out the plaintiff's allegations, I think that's on volume 16, C. 4734 and 35, says the gist of the conspiracy is the complaint that workers weren't warned and people who use products weren't warned. So really what we're talking about when we expand that to household cases is consequences of a conspiracy, and we contend that that is too far afield to recognize the duty in this case. The other reason for there not being a household duty in this case deals with foreseeability, and I would refer the court respectfully to Martin v. Cincinnati Electric and Gas, a decision by the Sixth Circuit applying Kentucky law. In pages 445 and 46, the court very clearly explains why in the 1950s there was no foreseeability as to household exposure. When was there foreseeability? I believe there was foreseeability in 1964 and 65 when there was the first publication of an epidemiological study by Newhouse and Thompson that for the first time showed, based on scientific evidence, that asbestos exposures at home could be injurious. I think you argued that the last time. That's right. In this case, Your Honor, we have exposures in 1953 through 1956, and in the Martin case, specifically, it dealt with the lack of foreseeability in the 1950s and referred to Dr. Kastelman's report in that case and to his treatise. In fact, in volume 27 of the transcript, pages 200 to 206, Dr. Kastelman again, I believe, concedes that there was no foreseeability in the 1950s. He identifies that he was the first case in the world of household exposure in 1960. He also adds in those pages, or concedes in those pages, rather, that until mesothelioma was recognized as a signal disease for asbestos, then there was no way to prove that any low-dose environmental exposure could lead to disease at home. And that's what we're talking about, not the fact that asbestos can be dangerous, but at the dose that it could be at home, a low dose, was there any foreseeability of injurious exposure? And the court properly held in Martin that there was not foreseeability based on essentially the same kind of testimony and writings and opinions that Dr. Kastelman expressed in this particular case. So for those reasons, we believe that there should be no household duty. In general, for policy reasons, no relationship, limitless liability that we explained, but also in the facts of this particular case, because all the exposures were in the 1950s when it was not foreseeable. Turning to the green sheets issue, the green sheets were excluded by the court. Those were publications in the Asbestos Worker Journal. They were green in color, hence the name. And they were published in 1969 through 76. Johns Manville participated in those publications, funded those publications, actually had people who were on the board of the Insulation Industry Hygiene Research Program, and its employees were quoted in those publications. The reason that we offered those publications in our written offer of proof and our oral offer of proof was to show conduct by Johns Manville that was inconsistent with conspiracy. It was also evidence that would rebut the post-exposure and post-OSHA evidence that was admitted as evidence over our objection to the trial of this case. The plaintiff responds that the green sheets should not be admitted because they're not noticed to the plaintiff. And the difficulty with that argument is that notice to the plaintiff is an issue that pertains to an independent duty case. You have independent duty to the plaintiff, then the issue is what that particular plaintiff knows. Well, we argue that this should be an independent duty case in which there is no liability at all. The plaintiff says no, independent duty is not required under Illinois law. And so the plaintiff cannot have it both ways, that there's no independent duty requirement, and yet evidence can't be excluded on the basis of a concept that pertains to an independent duty situation. So what we're saying is the green sheets are relevant evidence to show that Johns Manville's conduct was inconsistent with the claim of conspiracy in this case, and it should have been admitted as evidence. Punitive damages were awarded in this case. Our argument is, citing Ross v. Conoco, which is a Louisiana case, that punitive damages are appropriate only against the defendant whose conduct actually caused the harm. The plaintiff responds that Ross isn't Illinois law. But if you look at the jury instructions in this case that were given by the court, and the instructions that were tendered by the plaintiff in conformity with Illinois law, you see at pages C4698 and C4729 two concepts. One is that ABEX is responsible for punitive damages only if its conduct approximately caused the injury. And it has to be more than just its conduct. It has to be the conduct of its managerial employees, or conduct that is ratified or authorized by management of the company. In this case, we're dealing with household exposure attributable to exposure to asbestos of Leslie Corey at UNARCO. Certainly, conduct at UNARCO is not attributable to managerial conduct of ABEX, wasn't authorized or ratified by ABEX, and the jury instructions require that for punitive damages to be assessed, the approximate cause has to be ABEX's conduct. So we say that the jury instructions in this case of Illinois law is consistent with the Ross v. Conoco case, and as a matter of law, there should be no punitive damages. We also say that there should be a new trial in this case on the punitive damages issue because of the failure of the court to give instruction to the weak tender, ABEX 29, which is required, we believe, by the Philip Morris case, United States Supreme Court. As the court probably knows, in any asbestos case, there is plenty of evidence that comes in that deals with injuries to other people, the history of asbestos, the state of the art. All that implicates injuries to people other than the plaintiff. The United States Supreme Court, in the Philip Morris case, said that the jury is not entitled to punish the defendant based upon harm to other people. We tendered that instruction, it was refused, and we believe, at the very least, a new trial is merited on that. This is a case involving intentional conduct on punitive damages. In the Illinois Pattern Jury Instruction, Section 1401, citing the ARCO case by the Illinois Supreme Court, the instructions make it clear that when you have punitive damages, you must show willful and wanton conduct, and it can be of two varieties, intentional or reckless. In this case, the only claim made was intentional conduct, so that requires intent to harm. We submit in this case that the evidence clearly does not show intent to harm. Pages 34 through 36 of our brief encapsulate a lot of evidence that shows that AVEX took a lot of precautions to try to protect its employees from injurious asbestos exposure, and internal documents by AVEX, by upper management people, who candidly expressed that they didn't think that asbestos was a problem at AVEX for various reasons that were justified in their minds. That does not show an intent to harm anybody, and therefore punitive damages as a factual matter or legally sufficient matter should not be awarded in this case. Last, I'll touch briefly on the conspiracy instruction, which is sometimes difficult to analyze. Let me try. This is the way I read McClure. McClure says, it really adopts principles of mutual assent. You can prove an agreement by proving words or deeds. You can show that the parties reached an agreement, that they would do their part to achieve mutual objectives. Or, you can prove by deeds or by conduct that there is an agreement. And there you have to have more than parallel conduct. You have to have conduct that evidences mutual assent. That's conduct that is planning, assisting, or encouraging in the words of the McClure opinion. So those are two ways to prove conspiracy. The problem with the plaintiff's instruction in this case is it doesn't ever define what the additional conduct beyond parallel is. And worse than that, it says that it doesn't have to be the knowing or planning or assisting type of conduct that would evince a mutual assent. And in fact, it doesn't include innocent conduct that fortuitously aids in a conspiracy. All principles that McClure adopts. So, I read McClure as saying mutual assent is what you look at. Typical mutual assent principles. And we believe the instruction was error. Counsel, one question. Sure. Before you wrap up. It's my understanding Simpson v. CSX is on appeal to the Supreme Court. Correct. How far along in that process is it? I don't know, Your Honor, how far along that is. Okay. And Simpkins did not address foreseeability in the case. And also the exposures were after the 1950s in that case. Extended beyond the 1950s. Okay. Thank you. Thank you. Please proceed. Okay, please report. Good morning. Again, my name is Colleen Bateman. I'm here on behalf of Honeywell International, Incorporated. As with Mr. Simpson, I stand ready to answer any questions that you may have on any of the issues in this appeal. But without any questions, I do intend to focus on several issues that are stated in Honeywell's brief. And I'd like to start with Keep your voice up, please. Oh, I apologize. And I will try to do that. Thank you. I would like to start with the issue of the trial court's exclusion of parallel conduct by non-conspirators. This is an instance where, again, the allegation against Honeywell is civil conspiracy. And the civil conspiracy alleged is that Honeywell agreed with selected companies to either assert what was not true, which was that it was safe to be exposed to asbestos, and on which, in this record, there's no evidence against Honeywell. Or secondarily, that they agreed to fail to provide information to exposed persons about the harmful effects of asbestos. And Honeywell sought to introduce evidence that other companies, indeed every other company that used or was in the asbestos industry, as well as governments and unions, also failed to warn. Prior to trial and pre-trial proceedings, plaintiffs moved in limine and asked the judge to bar that circumstantial evidence. And the judge agreed. Now, again, Honeywell's defense in this matter is that it did not conspire. And as stated in the briefs, the defense is that it was the conduct, the independent conduct of UNARCO, non-conspiratorial, that resulted in the injury to Mrs. Redarmo. And there is no dispute, or it was not disputed at trial, that it was her first husband's exposures at UNARCO in 1953 to 1956, the asbestos fibers that he brought home from that facility, that caused her disease. And the defense, again, of Honeywell was they agreed with that exposure and that that was a causative exposure, but that that was a result of independent conduct. And the court refused that evidence over Honeywell's objection. In granting plaintiff's motion in limine, the trial court disregarded two Supreme Court decisions, McClure and Nolan. I'll address McClure first. Under McClure, if facts and circumstances relied upon are as consistent with innocence as with guilt, it is the duty of the court to find that the conspiracy has not been proved. The purpose in providing this evidence, this circumstantial evidence, that other companies, not selected by the plaintiffs to be in this alleged conspiracy, had information and they likewise failed to warn. And it wasn't just one or two companies outside the conspiracy that failed to warn. According to plaintiff's own expert, Dr. Castleman, it was every company in the industry. It was the government, the federal government, the state government, the local governments. They had information, again according to plaintiff's own expert, and nobody warned in the 1953 to 1956 time period of exposure in this case. McClure also noted that an inference of an agreement can be undermined by the circumstances surrounding the conduct. Again, this evidence was offered to provide the jury with the circumstances surrounding the alleged conduct. Essentially what happened in this case with the exclusion of this evidence is that a false world was created. So far as the jury was told and what they heard was that these companies that are alleged to be in this conspiracy and only these companies failed to warn about the hazards of asbestos during the relevant time period. And based on the record and based on the evidence and based on Honeywell's offer of proof with Dr. Castleman, that's simply not true. So McClure focused on the innocent explanations for parallel conduct. And the failure to allow Honeywell to pursue the evidence through plaintiff's expert, that nobody was warning, that the parallel conduct that is the linchpin of the allegation against Honeywell and the other alleged co-conspirators is not unique to them. It was universal. It was state-of-the-art. It was the industry norm. It was the way everybody did it at the time. Under Nolan, moving to Nolan, the court in that case focused on the purpose for which evidence is offered. And the plaintiff's position in moving to eliminate or bar this evidence is that you cannot disregard your bad acts by pointing to somebody else's bad acts. And that misstates the purpose for which this evidence was offered by Honeywell, as I've just explained to the court. And Nolan, at 233 Il 2nd 437, stated that although the circuit court allowed plaintiff to introduce circumstantial evidence to satisfy her burden on the causation element, it also excluded evidence which defendant wished to present to rebut plaintiff's claim and to support sole proximate cause defense. Sole proximate cause, of course, is a separate issue. Again, the Honeywell defense is that it was the sole conduct, independent, non-conspiratorial conduct of Unarco that caused Mrs. Rudarmill's injury. But under Nolan, it's error to allow circumstantial evidence in for plaintiff to prove their case, but to exclude and deny defendants the opportunity to present circumstantial evidence to rebut that position. This is not a case where the evidence was offered to shift the burden to either a tortfeasor or a non-party. It was evidence that was offered as circumstantial evidence to allow the inference that the jury could draw that the conduct, the parallel conduct, that again was the linchpin of the allegation, was innocent, and under McClure, that evidence needs to be allowed and considered. The other issue that is new to this case, as opposed to the Holmes argument that Justice Turner mentioned from last month, is that this case does involve punitive damages in this case. And the error in excluding this other company parallel conduct evidence is exacerbated in this case because of the error in allowing the case to proceed with punitive damages. Mr. Simpson has addressed the punitive damages issue, but I would like to address that, focused first on Honeywell's conduct and tying it back to this other company evidence, other company parallel conduct evidence. The intent to harm is the intent that must be alleged in a civil conspiracy for punitive damages. It has to be malicious. As the Lloyds decision said, 138.02.404, it has to be something that is almost akin to a criminal conduct. There is nothing on this record that the predecessor of Honeywell, Bendix, had any intent to harm. The intent, as alleged by the plaintiff, is the intent to enter into the conspiracy, to fail to warn, with the intent to continue to be able to sell the product. There's just simply nothing in this record that would support a finding that the intent was to harm. And again, that's all the more relevant when you consider, first of all, foreseeability, which has been addressed by Mr. Simpson, and second, the fact that, again, this intent, this failure to warn from this select group of defendants, is the same as the intent. It's universal conduct. So to use that intent as the basis for punitive damages, when it's the industry norm, as acknowledged by plaintiffs and experts, we believe was in error. Briefly, in my remaining time, I would like to address the issue of 237B, Supreme Court Rule 237B. In this case, Honeywell was required to produce over-objection to former employees to testify at trial. These employees never actually worked for Bendix. They came to successor companies after the date, and we objected to producing them as not being officers, directors, or employees of the company, relying on the White v. Garland decision from 2010. Our objections on that point were denied, and we were compelled to bring Mr. Charm and Mr. Koss to testify, because of the fact that they do act as independent consultants for Honeywell. It is undisputed, however, that they are not employees, directors, or officers. The Supreme Court Rule 213D, which deals with interrogatories, and the swearing of interrogatories when they're directed to corporations, indicates that those sworn answers can be made by an officer, partner, or agent. As this Court held in White v. Garland, the Supreme Court is careful in their wording. They select their words carefully and precisely. The difference in the wording between officer, director, and employee in 237B, and officer, partner, or agent in Supreme Court Rule 213 is significant. Mr. Charm and Mr. Koss should not have been required to appear. And this is not an issue that is minor. These are witnesses who are on the stand, all told, together for three days. These are witnesses who are presented with documents of which they have no personal knowledge, are asked to provide their opinion, and we believe it was fair for that to go forward. Thank you. Thank you, Counsel. One or both of you will have rebuttal, however you've got that set up. And Mr. Wilder. Good morning. I represent Redarmals. We're asking you to affirm. I'd rather not take questions, but I will try to answer them if you have them. And I'll try to hit some of these things very quickly. The last issue mentioned, actually perhaps we should start with the household exposure issue. The Simpkins case, I've read CSX's brief in Simpkins, so they're past that point. I've read the amici, if you say that, brief of some of the business interests, so I know those have been filed. I don't know where the Appalachian brief has been filed or not. I would take issue with Mr. Simpson as to the Simpkins case. The exposure extended beyond the 50s, but the exposure as to CSX was 58 to 64. That's right in the opinion. CSX is the defendant on household exposure, and it's alleged that Annette Simpkins' husband worked for the B&O Railroad, who was a predecessor to CSX, 58 to 64. And then he worked for other people and was exposed as other defendants. The court in Simpkins did address foreseeability, and in fact found that it agreed with the Alivo court out in New Jersey saying that the particularized foreseeability of a spouse laundering clothing is something that could be foreseen. Now Simpkins goes up on a motion to dismiss issue, so the court was accepting what was said in the complaint, but there is discussion of foreseeability in Simpkins, and it is 58 to 64 that's at issue in Simpkins. When it was foreseeable that people could get sick, I'm assuming that question could be coming, I would say before, obviously before 53, and the reason for that is the defendants in this case say it's their position on a household exposure case that you have to see the particular harm as to the particular class of plaintiff. And I suggest, I understand why they take that position, but it's overly restrictive, it's inconsistent with Illinois law, it's inconsistent with the idea from Ward v. Kmart, or in Simpkins there's discussion of that. You just have to know there's a general harm. Was there knowledge of a general harm? The first reports on cancer came out in 35. By 48, when Avex's corporate medical director, Hamlin, decides to return the Saranac study report back to Manville, or he's ordered to return it by his boss, in an exhibit, it's exhibit 360B, it's Hamlin's memorandum from November of 48, where he says it looks to him like the only concern is repercussions from a legal point of view. This court said in one of the Burgess opinions, returning that report would be a tort itself, in terms of an act that would support the conspiracy, but repercussions from a legal point of view, and that's because such reports are frequent in the literature, both here and abroad, and the defense expert in this case, Dr. Dyson, says that he thinks Hamlin's referring to the 80 to 90 reports of cancer that were already in the literature by 48, which is why Hamlin, the doctor, wasn't that concerned that the report talked about cancer. There were more reports after 48. There was an editorial in 49 about cancer, and it may be in rebuttal that Mr. Simpson would say, well, see, everybody knew. Well, the medical literature showed that doctors knew and researchers knew, but there's no showing that any of the people like Les Corey, who were working at the plants or who were working with products, knew. And, in fact, the first reports on mesothelioma came out in 43 that gave it that name by a German doctor. There were more reports in 52 here in the United States, but that's just a type of cancer. And, in fact, the testimony of trial was there were mesothelioma cases that were called pleural cancer of the lung, the pleuris lining, called pleural cancer of the lung, called endothelioma. They called it a lot of names. They finally settled on the name mesothelioma somewhere in the 50s, but so it was known that asbestos could cause cancer, and it was reported in the testimony of these cases, it was reported not just on the fellow who worked with it or the guy who went to work and poured out the asbestos bag. It was reported in office workers. It was reported in bystanders going clear back before 1930. Was it reported in a wife at home? No. What about the argument he said that, well, it's a low-dose exposure. Nobody knew about low doses could be harmful. Plants Exhibit 400A is the outline to the companies from their researcher Gardner at Serenac, February 24, 1943, and he has an outline of what he's going to publish. Now, in there he talks about cancer, but he also, at the end, talks about the fact that the recommended exposure to asbestos was 40 percent, and the company went to the companies at 43, so they knew they couldn't rely on the threshold value. This case, I think, is a little different than Simpkins, or for that matter, the Nelson case, which was discussed a month ago, and still. This case is not a premises liability case, and in fact, it's more than even an employer case. Simpkins is a failure of the employer to warrant, CSX to warrant, its workers, because the overt acts in this case is a conspiracy case, and it's alleged the overt acts include Unarco's employment of LESS without telling LESS. I think that's overt Act B in the complaint, but overt Act A is that Johns Manville and Raybestos sold products to which LESS was exposed, and the dust came home. So that's not even an employer-employee relationship. That's somebody supplying a product into the stream of commerce, and I would suggest in that situation, nobody's ever said you have to have a special relationship when you supply a product into the stream of commerce. The issue is, is it foreseeable that members of the public, whoever those members are, that come and have some association with the product or some contact, whether they can be entered or from what comes off the product. Is there evidence in this record, because that's what it's limited to, that would support foreseeability? That's the same as in Holmes. Some of the evidence we put in, there were articles in 1913 about not taking dust home. Industrial hygiene, 1924, provide showers so you don't take the poisonous dust home. Apex put in an exhibit that it had showers at one of its non-asbestos plants for the workers to change clothes. There was testimony that in 1936, the state of Pennsylvania closed down a chemical plant because of the illness that was occurring among the spouses of the Honeywell. Honeywell says nobody could tell, and that's why we filed, and it wasn't in the trial, but it's a supplement at the time of post-trial, the testimony of one of the defense experts, somebody disclosed by both defendants, a Dr. Rodley from Duke, who in another case testified he thought it was foreseeable that it would cause cancer by the 1950s to these companies, which is maybe why they didn't call him in this case, a house of exposure case, but he was disclosed. Something else I was thinking as I drove down here is the defendants argue on this that it's an expansion of liability to extend these things to the spouses or the children of workers. It's not an expansion. It's a restriction that the defendants are trying to argue because these cases are not new. They've always occurred. This court considered Van Winkle back in 1997. There were two plaintiffs in Van Winkle. Don worked there the summer of 59 after he graduated high school. Thelma Hicks, it was brought on behalf of her family, she died from mesothelioma after Coleman worked at the plant 53 to 61. Now Owens Courting didn't raise anything about duty back then, and this court reversed based on an answer to a jury question note or a non-answer to it. But that was back in 97. And in McClure, there's three plaintiffs in McClure. Bob McClure worked at the plant and died of lung cancer from 59 to 61. Hugh Bicknell worked there in the 50s and died of lung cancer. And the third plaintiff in McClure is Bernadine Thacker, who alleged she had asbestosis as a result of her husband and son working at that plant in the early 50s to the early 60s. Defendants didn't make those arguments. If you look at their citations, it's only in the last 10 years that I guess somebody somewhere came up with the idea, well, let's say it's an expansion to bring it to the spouses. These claims have always been made. It's not the plaintiff's lawyers who are trying to expand. It's the defendants who are trying to say, now we want to restrict down to just the worker themselves as more, as wives get sick. They've been getting sick all along, basically. I better move on to cover some of the other things. You're not suggesting, though, that they're fair to raise it before it waives the argument? No, I'm not. But there's just some suggestion of like, well, maybe, you know, those darn plaintiff's lawyers. Now they're going to limit this liability to babysitters next. No, these claims have been, people have been getting sick. Counselor, before you go into your next topic, was Honeywell part of the group that employed Saranac to do the lab studies? There's no evidence. Well, there's no, they did not sign the agreement, so the answer is no. There was a meeting, and there's exhibits about that. There was a meeting called at Manville corporate headquarters. So then with regard to the decision ultimately not to publish certain portions of that. No showing Bindex was involved in that decision. Bindex, there's, it's, they canvassed the industry, Ray Bestis and Johns Manville. Bindex was in the industry. A number of companies attended. Nobody identified. We know from exhibits more attended than signed on. We know Bindex did not sign on. Were they there or not, nobody knows. So they weren't part of it. They were having exchanges with Metropolitan's doctor about silicosis. Manville was their exclusive supplier, and the Manville attorney says he canvassed the industry, but there is nobody, they did not sign on. And there's no showing they got that report the way Apex did in 1948. Well, that was what I gleaned from the briefs. I just wanted to clarify that, and I thank you. Very quickly, instruction 16 is basically a derivation of the instruction this court considered in Van Winkle. It's consistent with McClure and Burgess as to the idea that it did not instruct on innocent acts. Apex instruction 14 was given without objection, which is similar to one that was given by the defense in Van Winkle, which says there's no such thing as accidental inadvertent participation in a conspiracy. So the jurors were told you can't inadvertently be in a conspiracy. The green sheets, plaintiffs said those can't be noticed because it came out 15 years later, and neither Juanita or Les was a member of the Insulators Union. But in addition to not being noticed, counsel says, well, people from Johns Manville and Owens Corning participated in them and were quoted. All Johns Manville and Owens Corning did was provide funding to Mount Sinai. Mount Sinai came up with the contents of the green sheet. And I kept inviting, and the trial court said, you know, if you can show me where J.M. or Owens Corning decided what would be in the green sheet, that'd be one thing. All they did was provide dollars. Johns Manville had people set on the board. One of them was a guy named Punzack. Punzack is the individual exhibit 330 by the plaintiff. It's Punzack's testimony in 72 saying don't put cancer on the warning label. Oh shit, if you do, it will cause an undeserved economic impact and it will scare and terrify people. So the mere fact he was at the same time serving on board doesn't sound like he was, I'd suggest there was evidence he wasn't too desirous of getting the word out. And in terms of people being quoted, there's a guy from Owens Corning. It's exhibit 508, one of the green sheets. He is quoted in 1971 when addressing insulation contractors to the effect that it can cause one congestion in disease, nothing about asbestosis or cancer. And I left it and the trial court left it. If you can show where J.M. or Owens Corning people or any of the alleged conspirators talked about asbestos or cancer in the green sheets, then that exhibit comes in. It's not there. All they did was provide funding. 237, Coss and Charm. We cover this in our brief. It's about as different from Dr. Carlson and White as you can be and it's exactly what Justice Appleton talked about in his concurrence. First of all, Coss did work for Bendix and he was groomed beginning in the 80s to be their corporate litigation guy. He retired in 97. Charm was the head at Allied. Allied bought Bendix in 83. Charm retired in 97. They both opened their consulting arrangements where they both testified for Bendix, for Allied, for Honeywell. They've been designated as corporate representatives, Rule 206 corporate representatives. Charm sat in the first Dukes trial as the corporate rep at trial in 2005. They signed interrogatory answers. They testify. They provide all the testimony under oath. Charm has testified that he knows of nobody who the company has designated since 97 except him and Coss in terms of any signing interrogatories, verifying requests for production, Rule 206 production as to what the company knew, or at the time of trial. So these are the individuals who are, quote, not employees and therefore, I mean, this is just what the concern was. They provide all the sworn testimony, all the sworn answers, and then when it comes to Rule 237, Honeywell wants you to say, well, wait, you don't have to come in and address what you previously said under oath. We don't have anybody because we always pick Coss and Charm, these retired independent contractors. So we cover that in our brief. There's even more than that, but I mean, they called Charm to testify in Dukes 1 in addition to sitting there at the trial as their corporate representative at a time when he was, quote, an independent or retired employee. So that's the 237 issue. As to punitives, the jury was instructed consistent with IPI, which has pattern instructions 35.01 and 35.02. Variations were given. There was no suggestion that either my partner or I ever argued that you ought to punish the defendants for the other people who got hurt. And in terms of whether there was evidence, that's part of the doctrine. IPI says you consider how reprehensible was the conduct, the frequency of the misconduct, whether it was attempted to be concealed, the enormity of the wrongs, all of that goes to it. But we never said return, and if you look at these punitive damage amounts, 100,000 as to ABEX, 400,000 as to Honeywell, nobody's saying that it somehow shocks the conscience or was out of proportion with the compensatory damages. They were actually less than compensatory damages. As to the idea of the hundreds of companies, the testimony, the actual testimony that was given was that nobody warned Dr. Kastman, and that is the fact. Nobody warned. And then he was asked a string of questions, and I believe it's in Honeywell's reply brief. General Motors knew, didn't they? Yes, they did. Monsanto knew. Yes, they did. In fact, many, if not all, of the companies knew. He said we've covered various types of companies, and many of them, and certain individual companies, and they knew. The problem is we couldn't prove this case just by parallel conduct. We had to show why these companies, I mean, in a clear appellate decision, this Court said that would be sufficient, but that was reversed at the Supreme Court level. And so you have to show contacts in addition to parallel conduct. You have to show what they knew, why they didn't tell. And there's no evidence how much General Motors knew, why General Motors didn't tell, what the association was between General Motors and these other companies that are alleged to be in the conspiracy. When did Monsanto know? What did Monsanto know? Had Monsanto participated in research? Why didn't Monsanto tell? You know, it would be a mini-trial as to each of these other companies. Many companies would probably, I shouldn't say probably, this Court has heard appeals where one of the defenses from some of the companies that didn't tell is the industry leaders didn't tell them. Sprinkler Insulation in the Boldini case, its defense is nobody told us and we wouldn't have employed the insulators. So it would have required, number one, mini-trials, and number two, we never suggested that they should be liable solely because of their parallel conduct as opposed to there's parallel conduct and contacts. You can make an inference. The jury was instructed that, consistent with McClure, that parallel conduct can be considered as evidence of agreement, but parallel conduct by itself cannot prove an agreement. That's in Plaintiff's Instruction 16 on the principles of conspiracy. So we had to show more. And that's why the trial court allowed our order. Now as far as the government's not telling, I still don't understand how it can be a defense to these companies if it's shown that they had a mutual understanding that the federal government didn't get around the passing of OSHA until the 70s and therefore lacked the power to make the companies tell before then. And the companies factored that into what they did. Plaintiff's Exhibit 14 is an Owens Corning memorandum where Owens Corning talks about the idea of expanding because it's having a record year of selling asbestos products without warning, KALO products, but the author says there's one additional factor we should consider. Pretty soon now the government's going to blow the whistle on asbestos and we better make damn sure we have an answer to that threat. So the government didn't have the power to make them tell. The government wasn't manufacturing asbestos products. And when they say in a rebuttal, there's also evidence the government wasn't telling people who worked. Well I say in response to that, probably shame on the government, but that doesn't prove whether there was or wasn't a conspiracy among these eight companies. So I think I've covered the items which have been addressed. This court made certain pronouncements in Dukes. This case was tried post-Dukes. It was tried April of 2009. There was nothing about the price fixing. There was nothing about the Ernie Martin letter. All of the exhibits from Dukes, what we call Dukes I, were in evidence, again, as well as additional exhibits. And those created jury questions from which a jury had to decide based on the evidence whether there was or wasn't participation in a conspiracy. And I think the jury's verdict here was support. So we'd ask you to affirm. And if there's no questions, I think the time is up. Any questions? Counsel, thank you very much. Rebuttal, please. Let me start off by saying that Mr. Wilder and I almost always agree on what we disagree about. So as far, I think what I said when Simpkins was it extended past the 1950s and the 1960s. I certainly didn't mean to suggest it only dealt with post-1950 conduct. But I think that's what I said. I certainly meant to say that. And I think we're on the same wavelength as far as the foreseeability issues, motion to dismiss. So they took as true, and they said the allegation that B&O knew or should have known. So I think that addresses that issue. I disagree with Mr. Wilder on whether you can extrapolate from lung cancer or other types of injuries or problems or diseases. And in fact, that's what Dr. Castleton said at page 203. I asked him this question. Would you agree with the statement that lung cancer, which was widely recognized as opposed to mesothelioma in the 1950s as an asbestos disease, was too nonspecific to enable observation of a case or two to lead someone to think that this was something that had been brought home from the workplace as dust in the household and could cause someone to get cancer? Answer, yes. So you can't extrapolate from cancer that there was asbestosis or cancer and therefore we should have known it was getting to the home because you really are talking about dose. And when you talk about exhibit 400A, Dr. Gardner is saying, well, midget impingers may not give you the accurate reading. It may not count all the fibers. Maybe electrostatic precipitators would be better in counting fibers. But Dr. Gardner in 400A, who refuses to look at it, says nothing about low dose, environmental dose, dose that's so low that you can get mesothelioma at home. There was nothing like that in the 1940s or 1950s, and that's what Dr. Castleman testified to. We say that it was unforeseeable for exposures in 1953 through 1956 to lead to foreseeability that would justify a cause of action for household claims. As to the issue of foreseeability as to manufacturers... Well, if I'm following your argument, you're saying Castleman's testimony actually helps you. Yes. Makes your case for you. I read Castleman's testimony just the way the Sixth Circuit read it in Martin v. Cincinnati Electric, Gas, and Power, that it doesn't say that it was foreseeable in the 1950s. Dr. Castleman gave this testimony after I had to post him on those particular points and said you can't extrapolate from lung cancer and that while Dr. Huper talked about environmental exposures might be out there, there was no way to prove it until you got a signal disease that you could then track home and say this must deal with asbestos exposure. So we're saying that Dr. Castleman in this case shows or does not have any proof that it was foreseeable at the time and in fact says you can extrapolate from lung cancer or other diseases because lung cancer is too nonspecific. You can have smoking. You can have other reasons for lung cancer as distinguished from mesothelioma. So that's why we say in this case that it's not foreseeable. On the green sheets, I'll just say that there were statements about health hazards by Mr. Jobe and Mr. Bradshaw of Johns Manville and Owens Corning, and if you see for eight years statements about cancer and mesothelioma in a publication that you're funding, that's good evidence that you're not part of a conspiracy and it should be admitted for that purpose. Thank you. Briefly, Your Honors, with regard to 237, again, following Mr. Simpson, there are points obviously where we agree about what we disagree with Mr. Wilder. On 237, this is not an issue that is identical to the special concurrence from Justice Appleton in the White v. Garland decision. As in the special concurrence, there is absolutely no evidence on the record of an intent to evade the strictures of 237B. These gentlemen, as Mr. Wilder indicated, plaintiff indicated in his response argument, had the independent contractor relationship with Honeywell going back to 1997. And they have this arrangement consistently since 1997. So this was nothing that was created to avoid 237. And in fact, in the Oak View New Lenox School District case against Ford Motor, which is a third district case, that involved an issue of somebody who had signed discovery and ultimately was not required to come in because he didn't have personal knowledge. We're talking about events going back significantly, and I think the Oak View case is significant on that point. And I don't think that the concern raised in the special concurrence is a concern in this case. With regard to other company evidence, the fact that plaintiffs are required to prove more than parallel conduct does not deprive the defendants of the ability to defend an element of their claim. And an element of their claim, and not just an element, but the element, is parallel conduct. And we should have been allowed to present the evidence to rebut that circumstantial evidence. Thank you. Thank you to the three of you. The court will take the matter under advisement and stand in recess until 1 o'clock.